Okay, welcome everybody. We'll go ahead and call the case. Case number 21-4126. In re. Overstock Securities Litigation. Mr. Isencroft? Good morning, your honors. Thank you. My name is Michael Isencroft and I represent Plaintiff Appellants in this matter. If the decision below by the district court is upheld, it would mean that in the 10th Circuit, it will be legal for a publicly traded company to deliberately engineer a short squeeze to artificially inflate the price of its stock in order to enrich its CEO, because that's exactly what happened here. The timeline in this case is particularly telling. And before kind of briefly laying out some highlights, I want to point out that a lot of the timeline we have about Defendant Byrne's state of mind are from his own social media posts. So what he publicly chose to reveal. So I don't know what lies beneath the surface, but what's on the surface is plenty. In early July, Defendant Byrne put into motion a plan to sell 200,000 shares of Overstock Common. On July 26th, he publicly admitted to dating or having an affair with Russian spy Maria Botina, which he said would result his termination from the company shortly. On July 30th, 2019, four days later, Overstock and Defendant Byrne announced the digital dividend with a locked up feature. Importantly, the record date of the dividend was September 23rd, 2019. So anyone, any short seller who wanted to cover their position would have to do so by September 18th in order to avoid having to issue the digital dividend. So is it your contention that the sort of digital dividend in this case is inherently deceptive? Not the digital dividend itself, Your Honor. The locked up feature, but basically the decision not to register the dividend. So an unregistered security is inherently deceptive. I'm trying to understand if you could better explain to me your market. Just what is the basis for the market manipulation claim? What is the actual manipulative act at issue here? Sure. So it's the purpose of the unregistered dividend and the decision not to register it. So they gave no explanation for why they chose not to register. It is extremely unusual for a publicly traded company, especially one the size of Overstock, which is traded on the NASD, to not register security. And in fact, and the only purpose for not registering it was to essentially put short sellers between a rock and a hard place because they needed to, in order to meet their obligations under their contracts, to pass through any dividends that were paid in money or stock. But what they couldn't do is issue this dividend because it was unregistered and because it was digital and hadn't been issued yet. So let me stop you for just a minute. So in response to the question, you seem to be talking about some intent facts as well. The idea that it was locked up in and of itself doesn't make your case, right? Correct. It has to be. It is the intent of why it was locked up. And the idea that it was unregistered doesn't make your case. Correct. It has to be. I mean, there are a lot of situations where companies might want to have an unregistered security for cost reasons or not having to deal with regulatory authorities. Your case rises and falls on the intent in having these features. Exactly, Your Honor. That is exactly what we're saying here. And that's actually where the case law lies, essentially. If you intend to create an artificial price, this is the second circumcised capital. This is a lot of cases about that. It's the intent to create the artificial price. That is what makes it manipulation. So right before his departure from Overstock on August 22nd, Patrick Byrne changes his 200,000 share sell order to all his shares, what he calls a fire and forget missile. And he tells eight to 10 executives at Overstock of his plans. On August 22nd, he leaves the company and the country, going to South America, then to Indonesia, a country he publicly states he selected because it has no criminal extradition treaty with the United States. From Indonesia, from his yacht or sailboat off the coast of Indonesia, he monitors the price Overstock shares. He learns, he says that the SEC is going to kill the locked up feature and the short squeeze. So he decides to what he says is to accelerate his sales even more. So on September 16th, 17th and 18th, he sells all his shares for a total of $90 million that he says he turns into gold, silver and Bitcoin to save them from the deep state. On September 18th, he sells his last million shares. Overstock abruptly reverses course, ends the locked up feature, says it is now freely tradable and ends the short squeeze. Your recitation of the facts council seems to omit Overstock's compliance with SEC guidance. I'm not sure I understand your honor, where would it comply with the SEC? Wasn't Overstock working with the SEC to determine whether it was going to register or not register to determine the status of the lockup feature? Well, what Overstock did say when it ended the feature was that, you know, based upon or thanks to the gut, thank you to the regulatory authorities for its guidance. We have decided to, you know, our belief is that the SEC told them at the beginning, this is you can't do this. And they just kept going ahead with it anyway until the SEC told them you really have to stop. So we don't believe they ever got a green light from the SEC. In fact, we believe they got red or yellow lights the whole way. What do you mean you don't believe what are your pleadings on point? What paragraphs? Well, your honor, what we state is, you know, we don't know what went on with the SEC or with an Overstock, but we don't believe we state. And I in the complaint that the Overstock said it made these decisions at the behest of the not at the behest of the SEC. But in defendant Burns briefing here, we've got a little bit more of a clue where he said that it was after discussions with the SEC that they made the decision. So discussions with the SEC and, you know, don't usually happen overnight. They happen over time. We plead in the complaint that the entire industry was going through SIFMA and talking to the complaint, the SEC and regulators about this. This was a very hot button issue for a lot of investors who were very upset about what was going on here. So I just you know, we plead that the SEC does not turn on a dime that it takes. You know, it communicates multiple times that it doesn't instantly make decisions like this. So if it received a communication from the SEC, which we believe which we have plausible reason to believe it did, that it didn't happen instantly. And then after September 18th and Patrick Burns sold his position, he stated on social media, he admitted that he did not just dream this locked up dividend. He didn't call the lockdown. He did not just dream this up. He designed it carefully, knowing that it put legitimate short sellers in a bind. And then to, you know, icing to the cake, he basically taunted the government saying, if there be any criminal liability associated with this, let me stipulate here that I'm 100 percent responsible to come after me. Our assertion is just a very basic one. This is sufficient to move past a motion to dismiss on a securities fraud claim and get into discovery. The district court disagreed for three reasons. He held that one. Before you run on to the district court's ruling, could you tell me what role did the other two defendants see their names? Tell me quickly are Iverson and Nielsen. Yes. What what what are your allegations with respect to their conduct? For example, did they enrich themselves in any way through their conduct? And what was their conduct? We do not allege they enrich themselves through their conduct with respect to a locked up dividend scheme. We do not also allege we don't have any specific allegations signed for their position in which they participated in the dividend scheme. We are allegations for those two defendants are primarily with respect to the retail fraud scheme, which is a separate scheme that took place at the same time. But conduct primarily ministerial. What would you say? I don't believe that the one was the CFO. Really? I really wish you would drop your beliefs the door. Let's stick to the facts and the allegations, please. Yes. Iverson was the CFO. That is not a purely ministerial task that he is responsible for the finance of the company. And Nielsen was the president of the retail section of the company, not ministerial at all. They played a very significant role in the retail fraud. We do not have any specific allegations tying them to the locked up dividend scheme. Thank you. You're welcome, Your Honor. Let me let me bounce around a little bit about I want to talk about reliance. There's a fair amount of discussion about whether two presumptions of reliance apply. And I but that's not what I want to talk about. I want to ask you about actual reliance. And if you briefed that and argued that at the district court or did you rely on presumptions in your briefing and arguments before the district court? I believe we argued all three to district court, though our primary arguments were based in the affiliate presumption, the basic presumption. But, yes, I believe we plotted in the complaints and I believe we mentioned it. So the complaints, not what I'm interested in. I'm interested in the briefing and the arguments. Yes, I believe we did. OK. And I'm happy to talk about the presumptions if you'd like or the actual reliance, whatever you prefer or move on. I'd like to hear about the actual reliance. Sure. So basically, actual reliance is, you know, did did this did this scheme? Did the scheme of the fraud cause someone to make their purchases stock? So we allege in the complaint that mangrove, our client was a hedge fund purchased overstock shares because of the locked up feature of the dividend. It's very simple. That's why they did it because of the scheme created by Patrick Byrne. And I see your honors that I have only two and a half minutes left. Approximately. I would like to reserve that time for a bottle unless you have further questions. Judge Rossman. Zero. No, thank you. Thank you. All right, Mr. Dwyer, I think you're going 1st. I am. Good morning. May it please the court. I am John Dwyer on behalf of overstock Gregory Iverson and David Nielsen. With me is Mr. Driscoll, who represents Mr. Byrne. I'm going to reserve 3 minutes of my time for him to address the court. I understand that's my responsibility to watch the clock as a preliminary point. I would like to thank the court. It was my covid illness, which was pretty severe in October, which required the rescheduling of this. And I very much appreciate the accommodation. I had intended to address the retail that count one having to do with the allegations about the retail guidance. My sense is my time might be better spent fully devoted to the dividend unless unless the court would like me to address the retail guidance issues. I do have a question about that. I'm sorry. No, let's go ahead. Go ahead. Then I do have a question. OK, I just as a I just wanted to get a better understanding of the terminology, I guess. Is there a distinction between search engine rankings and search engine optimization? They're technically yes, but they're very closely related. Search engine optimization is the programs or the steps a company would take in order to improve their search engine rankings. That makes sense. So the rankings is sort of how well you're doing SEO or search engine optimization is sort of the effort. Get it. I think the terms are used interchangeably. Thank you. And my question is, with respect to the allegations or facts that were represented, how do you determine or how do you in your briefing distinguish between those that are prospective in nature and those that are historical in nature? Yes. I think we there are definitely two groups of allegations with regard to count one. One are projections having to do with the guidance and others. There's no question. There are also allegations of a few that there were affirmative statements of present fact that were false. The specific one. Let me see if I can just find a real quickly relates to. Relates to the statement. By the company. I'm sorry. Give me one second. There were two. One, that the company returned to a positive EBITDA in the second quarter of 2019. In fact, if you look at the company's financial reports, the company had returned to positive EBITDA in second quarter. There are no allegations by the plaintiff, other than the conclusory allegation that that is untrue. There are no allegations as to what the actual EBITDA number was, or anything else factually with particularity challenging that statement. And then the other statement of current fact that they challenge relates to SEO, as Judge Rossman had mentioned. And it's quite confusing in the in the briefing, because they challenge some statements at some times and other statements at other times. But I believe based upon their reply brief, the only historical statement now that they challenged with regard to the SEO performance was a statement by Mr. Byrd on July 15th, 2019, which he stated in June. Our SEO rankings took another big step in recovery. That's the other statement of affirmative fact. We address that. Your honor, if you let me put that statement in some context. On August, that statement by Mr. Byrd that's challenged was made on July 15th. On August 8th, 2019, Seth Moore, a non-defendant in this case, but a senior officer at the company, on an earnings call addressed the same issue. And on that call, and this is at page 1495 of the record, he referred to a slide and he said, quote, As was reported in a recent article in Search Engine Land in June, we made another significant breakthrough in the recovery of our SEO rankings. You can see that while we made 100% improvement year over year, we still have lots of opportunities to grow just to get back to get back to where we were in 2017. And slide 31, the slide that he was referring to, your honor, is in the record at page 1508. And if you look at that slide, you can see there's a graph and you can see the June number is at about 160,000. And you can see 2019 and the June number from 2018 is about half that. That's the 100% improvement. The plaintiffs have never challenged the accuracy of those numbers. And I believe the district court properly concluded that the particularity with which the company communicated the numbers actually provided SEO numbers on a month by month basis. And the fact that plaintiffs have not challenged that in any way really undercuts their position. They do not, other than asserting the statement was false, that there was improvement in June. They don't point to anything. And the data and the record shows that there was significant improvement in June of 2019. Is that responsive? Who asked the question? I think I think you did. But if there are no other questions about guidance, I'll move forward to the diviner. Thank you. So, first, I want to make. There are really two issues with regard to the dividend. The first issue is purely legal and other relates to adequacy of the allegations of the consolidated complaint. So let me first turn to the legal. Let's turn to the second of those for just one moment. And I'll tell you what's troubling me is you have a direct allegation and a and it appears to be no challenge to the proposition that your client acted deliberately to create a short squeeze and acted deliberately to profit from the short squeeze. That is to say, the consequence of his conduct is clear and his intent is clear. Therefore, you would conclude, it seems to me that you would bypass some of these traditional conflicts of evidence that would create our traditional summary judgment standard of review. And actually come to the conclusion that the intent has been established. Is that analysis correct or incorrect from your perspective? I respectfully I think it's incorrect. And let me sort of parse it out. Let me first start by making clear what the elements of a manipulation claim are. And I know that's a legal issue, but I'll address that very quickly and then get to the allegations themselves. The unlike 10B5B claims where all the courts are in agreement on how they articulate the elements. There's some some changing from circuit to circuit on what the elements are of a scheme claim. But in essence, plaintiffs in their opening brief cite a case called Dansky from the Second Circuit. And we're comfortable with the standard. And it says to state a market manipulation claim, a plaintiff must show one, the defendant committed a deceptive or manipulative act. Two, and furtherance of an alleged scheme to defraud. Three, with scienter and four reliance. I point that out because scienter and the deceptive act are two different elements. And so simply showing that you had an intent to deceive does not satisfy those elements. It is absolutely clear when you read all of these places, cases that you need to take some deceptive act. So, for example, we cite Wilson versus Merrill Lynch and O'Neill ships and GFL. Those are the three most important cases in some ways for sending this out. In those cases, make clear the deceptive deception is the grove and then have a manipulation claim. And that comes both from the statutory language, the regulatory language and some Supreme Court precedent. That consistent with with Lorenzo and the Supreme Court's understanding of the breadth of the conduct that we're talking about here. You're right. I've always had a hard time understanding plaintiff's position with regard to Lorenzo, why it's relevant here. So Lorenzo. So the Supreme Court decided Janice and in Janice, the Supreme Court said in order to be liable under 10 B5B, you need to be the maker of the statement and maker is actually the fine term in that. But you have to be the speaker and the maker. Lorenzo comes along. And in that situation, the defendant actually didn't make the statement. He just forwarded the statement to a bunch of people by email. And so the courts concluded in the Supreme Court concluded he could not be liable as a maker under 10 B5B. The question became, could he be liable under the scheme liability A or C? And the court said yes, because he took an affirmative act that was deceptive, which was the dissemination of the email, not not the content of the email, but he disseminated that email. For the life of me, Your Honor, I don't understand what the relevance is of that to this case. So since we don't have a market manipulation elements case right in our circuit. Correct. Not aware of one. If we weren't going to just adopt dance, what would be the underlying decisional law for us? We'd be looking at Ernst and Shriver cases like that. I think I think that's right. But I think you would also have to go back and you'd have to look at the statute. It's the statute specifically prohibits 10 B specifically prohibits devices and schemes as defined by the SEC. It's very limited to what the SEC defined. Then you go to SEC rule. And if you look at the rule itself, 10 B5A and 10 B5C, both of them make clear that you need to show fraud deception on its on its face. And then, yes, Your Honor, then I would go to the two Supreme Court cases. Let me mention one other thing, because plaintiffs make a big deal of it. There is this mastery case, which is a district court case involving the SEC. And there's a couple of other cases that do, to some extent, collapse this intent in an act or deception requirement. Let me say two things. First, SEC Capital, which is one of those cases, there was clear deception. And it's clear that the court said the problem there was that I think it's Credit Suisse that was specifically saying we're engaging in hedging activities that should have no impact on the price when they knew, based upon prior conduct, it would have an impact on the price. So there was deception there. But more importantly, mastery and the other cases deal with a very limited, to the extent their holdings are correct, a very limited situation. They deal with the situation in which there are open market transactions by the defendant. There are no alleged open market transactions by defendants in this case. And what mastery and those other cases say, if there's an open market transaction that otherwise would be legitimate, because people can go out and buy and sell, but if there's no business justification for it and it affects the price of the stock, that states a claim. That is not the situation here. And unfortunately, I have so much more to say, but I need to save my time for Mr. Driscoll. You know, let's do this. Let's go ahead and continue for a moment, because I have a question, and we'll make sure Mr. Driscoll has his opportunity. And then we'll make it right with Mr. Eisencraft here at the end, since we only have one case today. I bet Judge Lucero and Judge Rossman would indulge me in that. Absolutely. So you were talking about what my question is, is you were talking about the two elements in Dansky of scienter and deception. So I guess it would be that that two element analysis that makes you disagree with the plaintiff's argument about inherent deception. Well, I mean, because it seems like their argument sort of sort of presupposes that the act itself, the manipulative act itself is inherently deceptive. Right. And the courts do say, you know, that the terms of the manipulation is the term of art. Right. And they point to wash sales and matched orders, which are very specific transactions where basically the same parties on both sides of the transaction to create a sense of activity. And in those type of transactions, I do think are inherently deceptive. You go out and you trade, but you're not disclosing to people that you're also buying or you're creating a false signal. But I do think it's a separate element. In 10b5b, your honor, in this circuit and elsewhere, we have falsity in scienter. And there's no question that there are times where the falsity is so grave, so obvious, so pronounced, the courts infer scienter from that. And those two elements collapse a little bit on there. I don't think it makes sense. Well, in the 10b5b case, it never happens the reverse way. And I don't think it makes sense to do the reverse way to say if there's intent. And by the way, I want to be very clear. We do not concede that they've adequately alleged intent. And I want to get to that in a moment. But but I don't think if you can show intent, you can infer deception. There was no deception here. It's really interesting, your honor. You read the complaint. Not one time do they say they were deceived. Our brief, I think, does a pretty good job talking about the fact that, you know, we disclosed what the dividend was, how it was going to work, what it was going to happen, etc. And all these articles came out the next day and in seeking alpha and Bloomberg and all these things, understanding what impact it would have on on short sellers. But on top of that, so everybody understood what was going to happen. But on top of that, they never once in the entire complaint say that they were deceived. OK, thank you, counsel. Judge Rossman, you have any questions? There's a zero. I just had one question. Traditionally, the element of fraud, which is akin here to the deception, is places on the speaker a duty to disclose facts that would make a statement otherwise not fraudulent. That is to say, just conceal material facts when the intent is present. But if they fail to disclose that they were going to affect the offer, why doesn't that constitute an element of fraud, if not necessarily a full disclosure? I think if I can answer that in two parts, Your Honor, I think the O'Neill case, which we cite, actually addresses that in some ways better than I can. The plaintiffs in that case made that exact argument. And this is what the Second Circuit said in response. And I'll just quote it. Without more, plaintiffs claim is essentially that the defendant's failure at the outset to disclose that they were undertaking a manipulative scheme transferred their transactions into a manipulative scheme. This version of plaintiff's claim amounts to circular reasoning, such that plaintiff's allegations of a manipulative scheme are fatally conclusive. I think that would apply. That same kind of reasoning would apply right here. And then let me just make one more point. There's this sense I get maybe from the question in a little bit that they've done a really good job articulating allegations about what Mr. Burns' intent was. I actually think that careful scrutiny belies that fact. I'll just give one example. There's no question that the allegation in the complaint makes it clear that Mr. Burns understood what the impact on short sellers would be. There's no question about that. But by the way, so did everybody else at the time of the announcement. But he understood that. But for example, in paragraph 19 of their complaint at 871, they say that Burns intended to profit. He did this whole thing in order to profit. And quote, he did this to profit stating, quote, he recognized that the loss of dividend, quote, might cause a short squeeze and the stock price would increase as a result. And I would just ask the court, and this is just one example, if you actually look at Exhibit R, which is at 1534 in the record, you'll see the actual tweet from where those quotes are taken. And you will see they are badly taken out of context. And they in no way support the assertion in paragraph 19 that Mr. Burns somehow acknowledged an intent to profit from this process. And so I would urge the court to look at that tweet. It's pretty easy and simple. Go ahead, Judge LaSher. Well, I was probably indicating some skepticism about the last statement on intent to profit. I mean, clearly he intended to sell his stock. He, in fact, did not some of it, but all of it. I don't understand the last statement in the context of the facts that are before us. So I apologize. Yes, he clearly said that they have alleged that he understood that it could cause an increase in price, that he planned to sell some shares into that rise in price so that he would profit. I misunderstood your question, Your Honor, in a sense. I don't think they've adequately alleged that the purpose of the dividend was so that he could profit. I don't think that's what they've alleged. The complaint is replete with allegations that are very helpful to us. This company was a retail company that was dying, and they decided they were going to move to the spunky blockchain technologies, and they were coming up with a bunch of different technologies. In some ways, Your Honor, this was brilliant. When I first learned about this, once I got my head around it, what a brilliant idea. You're a publicly traded company. You're going to give a dividend to folks. You're going to allow, and you can clearly do it unregistered. It's clearly legal, and you get everybody onto your platform. Everybody's trying to do this, right? Everybody's trying to create a digital platform for this kind of thing to happen using blockchain technology. It was a really clever idea. I was pushing back on the idea that the purpose of the dividend was to benefit Byrne, as opposed to the purpose of the dividend was to benefit the company and its shareholders, including Mr. Byrne, by accelerating its transition to a company based on blockchain technology. Okay. Thank you, counsel. Mr. Driscoll? Let's give Mr. Driscoll three minutes. Thank you, Your Honors. May it please the Court. I am Bob Driscoll, representing Patrick Byrne, the former CEO of Overstock. I rely mainly on Mr. Dwyer's argument, but I wanted to at least mop up counts three and four of the complaint. Mr. Byrne's a defendant in all four counts, and the company's a defendant in the first two. Count three is control person liability count against Dr. Byrne, and count four is an insider trading count against Dr. Byrne. The district court made short work of both of these counts. It doesn't take up a ton of the briefing, and I think for this panel, it hopefully won't be too much of a problem. Obviously, Byrne is alleged to be the primary violator. He can't simultaneously be a control person violator. There's also, you know, obviously the initial question hinges on whether the panel finds any merit to counts one and two. We submit that it shouldn't, and therefore there's no possible control person liability in count three or insider trading liability in count four. And particularly to count four, the order of the trades really just takes care of this, that the plaintiff's purchase of shares was three days before Byrne's sale of any of his shares. And the case law we cite is pretty clear. We haven't found any contrary case law that it's simply in the wrong order to support an insider trading claim of any kind. And I think it's more just an attempt to transmogrify the manipulation claim in another form, but I don't think it works as an insider trading count. Just to clarify, you're relying on the contemporaneous that the plaintiff was not a contemporaneous trader as the reason why count four fails, not because it requires a predicate violation or both. What's the authority for the for the requirement for a predicate violation in our circuit? I don't think it exists yet, Your Honor. I think we switch to district court cases. I don't think it's been a formal holding by the 10th Circuit, but I think the case we collect in the brief or what would rely on. But I don't think we're taking the position that the 10th Circuit's already held that. But I think regardless the contemporaneous nature of the court would rely on that it could as well. So those are the main points I wanted to make. I also just want to point out a couple of timeline issues just to make sure the court has context. First is that Bern had left his CEO when these trades happened. He had left as CEO when the conversations with the SEC happened. And so there's sometimes an inference that plaintiff counsel made here that he was somehow aware of any conversations with the SEC that subsequently happened. And I would just reemphasize what Mr. Dwyer said that the statements about I mean that what's interesting about this transaction or this proposed blockchain dividend is the statements were all accurate. It was disclosed as unregistered. It was disclosed that there might be regulatory problems. It was disclosed there was some risk as to whether the platforms can handle it. And this is what happens with novel and interesting technology. That's the main right time. Thank you. So one quick question on the blockchain technology. As I understand your argument, you are saying that even though you your client knew that the issuance of the block chain in the manner that they did was going to be opposed by the SEC. He operated to make the statement anyway or make the offer anyway, knowing that the SEC was going to pull it back. And therefore, the fact that it wasn't pursued further doesn't really matter because it wasn't his conduct. It was the SEC's conduct. Is that essentially the argument? Judge, it's not the argument I was trying to make at all. I don't think there's any evidence in the record. And I'm not aware of any that that Byrne was of the view that the SEC would object to this to issuing an unregistered security at all. And I believe the company was getting advice at the time to that effect. So I don't think. But that is the that is the reason that they pulled the offer. Correct. That in fact, the SEC objected. I don't think they're not. What is the reason? I don't think it's clear that the SEC was the reason that the dividend was not issued. I think there are multiple reasons. And there was a vague statement that the company thanked the SEC for its guidance along the way. There were issues with whether or not this platform dinosaur trading could handle the volume of accounts that we need to open, because every registered shareholder of Overstock was going to need to open an account at Dinosaur in order to get the block chain dividend. That was there. There was an issue of what was going to happen with Wall Street, how they're going to treat the shorts and what their agreements would say about whether or not there could be a cash equivalent for the dividend or not. There are multiple moving parts, I think, as one would expect with a novel transaction. And so I think attributing it to an SEC, there certainly is not any SEC ruling that this is an impermissible transaction. I think that was that was my question is if it wasn't the SEC's opposition, then what was it that caused the defendants in this case to withdraw the offer of the transaction? Byrne wouldn't know because Byrne was in Byrne was in Papua New Guinea diving when the decision not to go forward with the transaction was made. So maybe Mr. Dwyer can answer that. Is it OK for me to answer that? So then let's move on to Mr. Eisencraft. So first, the complaint makes no allegation there other than the conclusory allegation that was illegal. But so the complaint is silent on the question. The answer. So it's outside the record. But the answer is there were difficulties. The SEC had raised some concerns, never said it's outside the record. It's probably not a good idea for us to start turning this into a summary judgment. There's nothing in the record on that issue. And the complaint is silent on it. Thank you. All right. So let's give Mr. Eisencraft another about seven minutes. So let's just bump him up to 10 minutes. Ready to start whenever the clock is. I don't want to. So, first of all, I want I want to respond to all those points, but I also want to make sure that something that has not been discussed gets discussed because it kind of got ignored by the district court. And that's the 10B5B allegations with respect to the locked up dividend. So we also allege that the statements about the dividend itself were false and misleading because they omitted the material fact that, one, they did not disclose that the dividend was the locked up feature was put into place for the personal benefit of Patrick Byrne. And two, that the whole thing was actually a head fake designed to entrap short sellers. The district court didn't even rule on these on these allegations. I just want to make sure that they are front and center here because we believe they are meritorious allegations. And it's also kind of illustrates why, even if this court adopts like the Third Circuit's kind of outdated view and GFI, deception is fulfilled here. Second, I want to push back on Mr. Dwyer's point that it somehow made sense for the dividend to be unregistered. If the stated purpose of the dividend was to increase trading on this new platform, not registering it means it could not be traded. So while as this court held in plural site, we don't have to evaluate defendant's hypotheticals. We don't have to gate every one of them. On its face, that does not make sense. It actually illustrates why there is no valid reason for them choosing to not register. And they put in their brief, well, maybe we did it because of cost. But but that's that's only partially right, isn't it? I mean, at some point that that became that dividend became tradable, didn't it? It had to be locked up because it was unregistered. But at some point later in time, it would become tradable. Eventually, your honor. Yes. But if you're if the stated purpose was to increase trading on the block chain, why would you not go through the simple, simple exercise of registering it? Which the company did all the time for all its offerings is a major publicly traded company. Second, with respect to that also, like there are certain regulatory requirements that you need to issue, even unregistered security like the the NASD has a requirement that they never fulfilled, which, you know, indicates we think we plausibly allege that they never intend to go through with it at all. This whole thing was a hoax designed to make the short sellers think, oh, we're going to trap you. And then at the last minute, whoosh, you know, we're going to we're going to release the trap when the price artificially high. Patrick, we're going to sell the shares and we're all going to go home. OK, so that has to do with your that argument has to do with your ex dividend date argument. Yes, that is. Don't you have a problem there, though, from timing? Didn't they still have time after after your alleged date to register the after the squeeze ended to register the dividend date with NASDAQ? I know your honor that they ended the squeeze on September 18th. The date of issuance was September 23rd. They were supposed to at least 10 days before the date. It was never done. So, no, we don't have an issue there in terms of timing. The other thing I wanted to talk about briefly because I didn't get a chance to the beginning, but now in my generously extended time, I do is the the what I like to think of as the retail fraud allegations. So they're actually, you know, at their core, quite simple and kind of akin to pluralsight in that they're there. And I want to focus on just one of the misrepresentations, misrepresentations about the search engine optimization. They said we had seven quarters of search engine optimization improvement. And then later they said it's doing also continuing to do better. And they tied this to their performance, their EBITDA performance, et cetera. We have a confidential witness and we allege when they work there between October 15th to July 2019, we talk about their title, front end developer. We talk about the responsibilities. They were responsible for maintaining the Web page. And that confidential witness said there were no improvements in search engine optimization during that time period. I know because I maintain the Web site, which would have had to have those changes. And we didn't see any changes. And in fact, we didn't deliberately make any changes. But a lot of that time period, because of the holiday period, we don't want to risk any glitches. So we have statements saying search engine optimization got better. Confidential witness saying it did not change. That's sufficient to move past emotionlessness. Very simple, very clean. So. So I'd also like to talk a little bit about. Does the does the more specific. SEO data in the in the earnings calls, the charts and the earnings calls undercut your claim and your reliance on the confidential witnesses? No, no, they do not. You're right. Why not? Because just because first of all. Just because we did not allege every instance that was false or not does not make it true. We don't know what the exact numbers for SEO are. We just know they were didn't get better. But that's sufficient to show their statements that they got better were false. And could you say that again? Of course. OK. We don't. They have numbers on the chart. We don't know what the right numbers are. All we know from our confidential witnesses is that they did not improve. They said in their statements accompanying the chart that they improved. You know, that's that's we focused on. They said improvement. They didn't improve. Maybe your witness is wrong. I mean. They have a chart saying X. You have a witness saying Y. I mean, you say, well, because I have a witness saying Y, it's Y. Maybe they have a have a chart saying X, it's X. And that may be true at trial. It may be true at summary judgment. But at the motion dismiss, that's sufficient to get past and to figure out who is right here. Our witness, we may be wrong. We don't know for certain. This isn't a case where you have just a regular pleading burden. You have you have a higher pleading burden, don't you? Yes. We can't just say it's 50-50. I win. Yeah, I've got to go for I they say it's it's right. I say it's wrong. So I you have to draw the inference in favor of me. Well, we actually do more than that, don't you? Yes. But but the but the the PSLR still leaves us with the we've still the presumption that we have to take all pleadings is true. And that includes confidential witness pleadings. We do get all inferences in our favor still. And yes, I mean, as long as the allegations are are themselves are plausible. What is your understanding of why the district court reject allegations that the amended complaints allegations about the confidential witness? What is your understanding of the district court's ruling on that front? I had a little trouble parsing it, Your Honor, because in the one hand, the district court said that one of the confidential witnesses, you didn't name their title or where they got their information. And for confidential witness two, which is the one about the SEO allegations, we did all that. And he said it wasn't credible that we that that this person who ran the Web site or would know about the search engine opposition. But I think it is credible. So I believe he improperly weighed the evidence, which is, you know, proper summary judgment, but not an emotionless mess. It is a PSLR. But we still have we still entitled to all our allegations taken as true. All evidence is in our favor. And certainly he said she said one witness versus another. We're entitled to move into discovery. So I would like to talk to you since I didn't have a chance to before. Talk about the two presumptions for. For reliance. So first of all, affiliated youth, affiliated youth was a 10B5ANZ case that did involve what the district court described as affirmative conduct. The words affirmative conduct don't appear in affiliated youth. It's not a thing under the Supreme Court precedent. Affiliated youth, I believe, clearly applies the situation here. Even if, you know, for some reason affiliated youth did not apply, basic certainly does apply. The reason for a purchase, this is under Halliburton and basic, does not does not rebut basics presumption. Basics presumption applies at motion dismiss. And we have the Supreme Court in Amgen in 2013, Goldman Sachs in 2021 saying, you know, but it's a right judgment. You cannot rebut it. Motion dismiss. This court and CDC, CDC holdings in 2014 held that basis. Basic is a relaxed pleading standard that cannot be rebutted prior to discovery. The only case district defendant site is Merrill Lynch, Second Circuit. But that's 2011. I was before Amgen in Supreme Court, before Goldman Sachs, the Supreme Court and before this court decision, CDC holdings. So I think that basic clearly applies here as well. And I see my time, my generously extended time is running out. So I don't want to take your patience any longer. So but thank you for your time. Judge Rossman? Nothing. Judge Zucero? Nothing. Okay. Thank you, counsel. The case will be submitted and counsel are excused.